# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JUDY C. SMITH,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07cv00005 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,**[1] | ) | By:   PAMELA MEADE SARGENT |
| Defendant. | ) | UNITED STATES MAGISTRATE JUDGE |

## *I. Background and Standard of Review*

The plaintiff, Judy C. Smith, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Smith protectively filed her application for DIB on or about March 17, 2005, (Record, ("R."), at 13, 42), alleging disability as of December 18, 2004, due to neck and back pain, muscle spasms and thyroid problems. (R. at 14, 43.) The claim was denied initially and upon reconsideration. (R. at 24-26, 29, 30-32.) Smith then timely requested a hearing before an administrative law judge, ("ALJ"). (R. at 33.) The ALJ held a hearing on July 31, 2006, at which Smith was represented by counsel. (R. at 318-43.)

By decision dated September 14, 2006, the ALJ denied Smith's claim. (R. at 13-20.) The ALJ found that Smith met the nondisability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 19.) The ALJ determined that Smith had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 19.) The ALJ also found that Smith's musculoskeletal impairments related to her back and knee pain were severe. (R. at 19.) However, the ALJ determined that Smith did not have impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) In addition, the ALJ found that Smith's allegations regarding her limitations were not entirely credible. (R. at 19.) The ALJ also found that Smith possessed the residual functional

-2-

capacity to perform light work[2] that required no more than occasional bending, stooping, kneeling, squatting and crawling. (R. at 19.) Thus, the ALJ determined that Smith was unable to perform any of her past relevant work. (R. at 19.) Based upon Smith's age, education, past work experience, and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Smith could perform jobs existing in significant numbers in the regional and national economies, including those of a cashier, a food service worker, a motel cleaner, a laundry worker and a factory worker. (R. at 19-20.) Therefore, the ALJ found that Smith was not under a "disability" as defined under the Act and was not entitled to benefits. (R. at 20.) *See* 20 C.F.R. § 404.1520(g) (2007).

After the ALJ issued his decision, Smith pursued her administrative appeals, (R. at 9), but the Appeals Council denied review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 5-7.) *See* 20 C.F.R. § 404.981 (2007). Thereafter, Smith filed this action seeking review of the ALJ's unfavorable decision. The case is before this court on Smith's motion for summary judgment filed June 25, 2007, and on the Commissioner's motion for summary judgment filed July 18, 2007.

## II. Facts

Smith was born in 1962, which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c) (2007). (R. at 42.) Smith received her general equivalency

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. *See* 20 C.F.R. § 404.1567(b) (2007). Furthermore, a job is considered light work when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. *See* 20 C.F.R. § 404.1567(b) (2007).

-3-

development diploma, ("GED"), and has past relevant work experience as an assistant manager/cashier and as a cafeteria worker. (R. at 14, 321-22.)

At Smith's hearing before the ALJ on July 31, 2006, she testified that she had been unable to work since December 18, 2004. (R. at 321-22.) Smith testified that she stopped working because she had difficulty lifting objects and was afraid she was going to drop things at work, such as heavy pots, and that she was afraid she would burn herself or someone else. (R. at 322-23.) When asked about her primary reason for seeking disability, Smith testified that her primary reasons for seeking disability was upper and lower back pain that would be equal to a nine or nine and a half on a 10-point scale. (R. at 323.) Smith noted that mopping, sweeping or trying to run the vacuum cleaner made the pain worse, and she stated that the pain radiated into her right leg and was sometimes numbing. (R. at 324.) As a result of her pain, Smith testified that she could sit for 20 to 30 minutes and stand in one place for 15 to 20 minutes. (R. at 324-25.) Smith also testified she had arm pain and that her right hand went numb at times, causing her to drop things.[3] (R. at 326-27.) She stated her hand pain made it difficult to pick things up, to tie her shoes, to dry her hair, to take a bath and to dress herself. (R. at 327.) Smith also testified that she could no longer complete household chores and that she was unable to attend church as regularly as she would like. (R. at 327-28.) In addition, Smith stated that her "nerves" had changed because of her physical problems. (R. at 329.) She noted that she had crying spells about once a week and she isolated herself from others. (R. at 330.) Smith testified that she was prescribed Paxil which "kind of takes the edge off . . . sometimes." (R. at 330.)

---

[3] Smith testified that she was right-handed. (R. at 327.)

-4-

Dr. Susan Bland, M.D., a medical expert, also testified at Smith's hearing. (R. at 331-37.) Dr. Bland testified that Smith's musculoskeletal problems first appeared in her medical record in 2003, when her physician noted that Smith was previously diagnosed with fibromyalgia. (R. at 332-33.) Dr. Bland testified that Smith's back pain appeared intermittently in the record. (R. at 333.) She also testified that Smith developed knee pain in September 2004, and an x-ray at that time showed early degenerative joint disease; otherwise, she stated that the record did not contain much information specifically regarding knee pain. (R. at 333.) Dr. Bland then discussed an x-ray of the lumbar spine, which was made in October 2004, noting the x-ray showed mild facet degenerative joint disease at the L5-S1 level. (R. at 333.) Furthermore, Dr. Bland testified that an x-ray taken of the thoracic spine showed mild degenerative disc disease changes with osteophytes and disc space narrowing. (R. at 333.)

Dr. Bland also testified that in December 2004 it was noted that Smith had decreased range of motion in her back. (R. at 333.) Dr. Bland stated that a magnetic resonance image, ("MRI"), was taken of Smith's lumbar spine in December 2004, and the MRI was read as normal. (R. at 333.) In regards to Smith's treatment with a pain specialist in January 2005, Dr. Bland testified that Smith's pain specialist indicated a positive straight leg raise test, yet the pain specialist did not explain what caused the positive result. (R. at 333.) Dr. Bland indicated that the test would "imply some radicular problem, radiculopathy." (R. at 333.) Dr. Bland also testified as to the pain specialist's MRI readings, which the pain specialist read as revealing a minimal disc bulge at the L5-S1 level of the spine. (R. at 333-34.) In addition, Dr. Bland noted that Smith underwent an epidural steroid injection with no further follow-up. (R. at 334)

-5-

Dr. Bland testified that it was difficult to evaluate the medical records of Dr. John Scott Litton, M.D., because, from visit to visit, the history findings were identical. (R. at 334.) Dr. Bland explained that Dr. Litton's examination was "very often exactly the same," and it was, thus, difficult to determine if Dr. Litton's examination results were from the original history and physical or if Dr. Litton's examination results were from a current history and physical. (R. at 334.) Dr. Bland then testified that the record was, in some ways, very difficult to interpret and that there were some inconsistencies therein. (R. at 334.) Dr. Bland pointed out that there were certain places in the record that indicated a particular finding, while other places would indicate no such finding. (R. at 334.) With respect to Smith's back problems, Dr. Bland commented that most of what was noted in the physical exams was negative. (R. at 334.) Dr. Bland also pointed out that sometimes the record would indicate back pain without record of a back exam. (R. at 334.) Moreover, Dr. Bland stated that strength, sensation and reflexes were noted in the record as being normal. (R. at 334.)

Dr. Bland also testified that, in January 2006, Smith's fibromyalgia appeared again in the record, after Smith brought a disability form to be filled out. (R. at 334.) At that point, it was noted for the first time that Smith had tender points in various parts of her body, and Dr. Litton noted for the first time that Smith had generalized decreased strength and mild decreased strength in the upper and lower extremities. (R. at 334-35.) Dr. Bland did suggest, however, that the muscles tested at that time were not the muscles that would be affected by Smith's radiculopathy. (R. at 335.) Dr. Bland then noted a visit Smith made to a neurosurgeon in July 2005, which provided history consistent with some radicular type of pain. (R. at

335.) At the July 2005 examination, Smith was noted to have slightly abnormal gait, normal strength, normal reflexes, normal sensation and a negative straight leg raise test. (R. at 335.) A subsequent computed tomography, ("CT"), myelogram was performed in August 2005, revealing a small disc bulge at the L4-5 level of the spine and no nerve root compression or spinal canal stenosis. (R. at 335.) Dr. Bland testified that the most recent doctor's record in Smith's chart was in July 2006, when Smith presented to Dr. Litton, who reported that Smith had back and leg pain. (R. at 335.) Dr. Bland testified that Smith told Dr. Litton at that time of a prior disc herniation, which was recorded in Dr. Litton's charts. (R. at 335.) Dr. Bland also testified that Smith's back was her main problem, along with some problems with her right knee. (R. at 336.)

After reviewing the medical records of Smith, the ALJ asked Dr. Bland if Smith had any limitations based upon the objective evidence in the record. (R. at 336.) Dr. Bland testified that there were intermittent objective findings in the record and enough findings to be able to point to some limitations. (R. at 336.) Dr. Bland opined that Smith would be limited to light work. (R. at 336.) Further, Dr. Bland noted that Smith could occasionally bend, stoop, kneel, squat and crawl. (R. at 336.) Dr. Bland testified that there was not enough objective evidence to impose a standing and walking limitation. (R. at 336-37.)

Dr. Bland noted that Smith might be more comfortable with a sit/stand option, but she reiterated that there was not enough objective evidence in the record to make this finding. (R. at 337.) Regarding the neurosurgeon's finding that Smith was unable to work, Dr. Bland further testified that Dr. Litton's records "have not really shown clear-cut full-blown radiculopathy." (R. at 337.) Dr. Bland

noted that, with a disc bulge and without significant physical findings, she would anticipate that the neurosurgeon would not be doing a lot of follow-up on Smith, and the record seemed to show that Smith's neurosurgeon was ultimately going to defer to Smith's treating physician regarding long-term limitations. (R. at 337-38.) Dr. Bland testified that the type of objective findings in the record could cause different symptoms for different people and that chronic pain could lead to depression. (R. at 338-39.)

Norman Hankins, a vocational expert, also testified at Smith's hearing. (R. at 339-42.) Hankins identified Smith's past relevant work as a cafeteria worker as medium,[4] unskilled work, and her past work as an assistant manager of a retail store as medium, semi-skilled work. (R. at 340.) The ALJ then asked Hankins to consider a hypothetical claimant of the same age, education, pain and past work experience as Smith, who had limitations set forth in the physical residual functional capacity assessment performed by state agency physician Dr. Richard M. Surrusco, M.D., on May 2, 2005, and affirmed by state agency physician Dr. Michael J. Hartman, M.D., on July 20, 2005. (R. at 208-14, 340.) Hankins opined that such an individual could perform jobs existing in significant numbers in the national economy, including those of a cashier, a food server, a motel cleaner, a salad bar attendant, some laundry worker jobs and factory worker jobs such as an assembler, a machine feeder, an off bearer and a machine tender. (R. at 341.) of The ALJ next asked Hankins to consider a hypothetical individual of the same age, education, pain and past work experience as Smith, who had the limitations set out

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting of items weighing up to 25 pounds. *See* 20 C.F.R. § 404.1567(c) (2007). If an individual can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2007).

-8-

by Dr. Bland. (R. at 341.) Hankins opined that such an individual could perform the jobs already listed. (R. at 341.) The ALJ next asked Hankins to consider a hypothetical individual of the same age, education, pain and past work experience as Smith, who was limited as set forth in the physical residual functional capacity assessment completed by Dr. Litton in July 2006. (R. at 341-42.) Hankins opined that there would be no jobs available that such an individual could perform given that such an individual would not be able to work an eight-hour day. (R. at 342.)

Lastly, Smith's counsel asked Hankins to reconsider the second hypothetical, adding a limitation of no frequent use of the dominant right hand, as well as imposing a sit/stand option. (R. at 342.) Based on this hypothetical, Hankins opined that the number of jobs would be greatly reduced and that Smith would not have reasonable opportunities for employment. (R. at 342.)

In rendering his decision, the ALJ reviewed records from Dr. Dennis M. Aguirre, M.D.; Dr. John Scott Litton, M.D., of Litton Family Medicine, P.C.; Bristol Surgery Center; E. Hugh Tenison, Ph.D, a state agency psychologist; Howard Leizer, Ph.D., a state agency psychologist; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Michael J. Hartman, M.D., a state agency physician; Dr. Rebekah C. Austin, M.D.; and Lee Regional Medical Center, ("LRMC").

Smith sought treatment from Dr. John Scott Litton, M.D., from December 3, 2003, to July 12, 2006. (R. at 106-93, 215-94.) During this time period, Smith complained mainly of thyroid problems, fibromyalgia and back, neck and foot pain. (R. at 106-93, 215-94.) The record shows that Smith presented to Dr. Litton

-9-

on December 3, 2003, for a hypothyroidism follow-up. (R. at 174.) At that time, Smith was experiencing fatigue, myalgias, weakness and weight gain, while she denied any related symptoms such as arthralgias, cold intolerance, constipation, depression, dry skin, hair loss, memory impairment, menstrual irregularities or thick-tongued speech. (R. at 174.) Smith also complained of edema, which involved the entire right leg and had been getting worse prior to her visit. (R. at 174.) Smith's symptoms included extremity pain, while Smith denied calf pain, dyspnea, lower extremity skin changes, nocturia, orthopnea and prominent veins. (R. at 174.) Smith also complained of joint pain, which she noted had been present for at least the previous five years. (R. at 174.) Dr. Litton noted that Smith's joint discomfort was mild or transient, punctuated by episodic flare-ups, and he noted that the primary joints affected included Smith's lumbar and sacral spine, her knees and her feet. (R. at 174.) Dr. Litton noted that Smith's aggravating factors included anxiety, stress, lack of exercise and inactivity, while her associated symptoms included mild fatigue, difficulty falling asleep, joint stiffness for less than one hour after arising in the morning and "gelling" of joints after periods of inactivity. (R. at 174.) Smith denied any associated depression, swollen joints, redness, crepitation, effusions, skin nodules, night sweats, pleurisy or conjunctivitis. (R. at 174.) Dr. Litton noted that Smith's medical history was remarkable for osteoarthritis and was negative for fibromyalgia, among other problems. (R. at 174.) However, Dr. Litton noted that Smith was diagnosed with fibromyalgia at age 30 later in his report.[5] (R. at 174.) Moreover, Dr. Litton reported that Smith was negative for back pain, but he also listed chronic low back pain as one of her then-current problems and further noted that Smith was negative for myalgias, contrary to Smith's assertion of

---

[5] On multiple occasions in the record, Dr. Litton's treatment notes are contradictory regarding fibromyalgia and other symptoms or illnesses.

myalgias. (R. at 174.) Dr. Litton recommended referral to a vascular surgeon or a chronic wound care center for further evaluation and treatment of Smith's lymphedema. (R. at 176.)

On December 17, 2003, Dr. Litton noted that Smith was negative for back pain, myalgias, arthralgias, anxiety and depression. (R. at 171-73.) Among Smith's then-current problems, Dr. Litton noted edema, chronic low back pain, primary localized osteoarthritis in her lower leg and right lower quadrant abdominal pain. (R. at 172.) A neck exam revealed that Smith's neck was supple with full range of motion and that her thyroid was normal to palpation. (R. at 172.) Dr. Litton's notes from January 5, 2004, regarding Smith's hypothyroidism and joint pain are nearly identical to those from Smith's December 3, 2003, visit.[6] (R. at 168, 174.) Dr. Litton added major depression, recurrent episode (mild), to Smith's then-current problems and noted that Smith was now taking Ultram 50 mg. (R. at 169.)

On February 2, 2004, Dr. Litton again reported that Smith was negative for arthralgias, myalgias and back pain, and he again noted chronic low back pain, edema, depression and lower leg osteoarthritis among her current problems. (R. at 165-66.) Dr. Litton noted that Smith was then taking Paxil 10 mg. daily, along with other previously-prescribed medications. (R. at 166.) On May 3, 2004, Dr. Litton found that Smith was without depressive symptoms, but he noted that her then-current episode of depression had been present for the previous six months. (R. at 156.) Smith's Paxil dosage was increased from 10 mg. to 20 mg. (R. at 158.)

---

[6] For example, on both dates, Dr. Litton notes that Smith was diagnosed with hypothyroidism six months ago.

On July 14, 2004, Smith presented to Dr. Litton complaining of back pain, primarily located in the thoracic spine and the lumbar spine, radiating to her right buttock, posterior thighs and right calf. (R. at 153-55.) Smith characterized her pain as constant, mild in severity, dull, aching, burning and cramping. (R. at 153.) Dr. Litton found that Smith's back pain was a chronic problem with essentially constant pain and that her then-current episode of pain started more than 10 years previously. (R. at 153.) Aggravating factors to Smith's pain included lifting, bending over and twisting, while stiffness occurred after prolonged sitting or standing. (R. at 153.) Dr. Litton also noted paravertebral muscle spasms and radicular right leg pain. (R. at 153.) Dr. Litton reported that Smith denied any history of a prior herniated disc, among other symptoms and illnesses. (R. at 153.) Along with Smith's other medications, Dr. Litton prescribed Flexeril 10 mg. (R. at 155.)

Smith again saw Dr. Litton on September 28, 2004, complaining of joint pain in her left knee and back pain. (R. at 143-45.) Smith noted that the joint pain had been a problem for at least the previous five years and that her discomfort was mild. (R. 143.) Dr. Litton found that Smith's joint discomfort was mild or transient, punctuated by episodic flare-ups, and he noted that the primary joint affected was Smith's left knee. (R. at 143.) Dr. Litton noted that Smith's aggravating factors included anxiety, stress, lack of exercise and inactivity, while her associated symptoms included joint stiffness for less than one hour after arising in the morning, "gelling" of joints after periods of inactivity, crepitation, effusions and buckling of her knee. (R. at 143.) Smith denied any associated fatigue, sleep problems, depression, swollen joints, joint warmth, redness, pleurisy or conjunctivitis. (R. at 143.) Dr. Litton's left knee examination revealed pain with

-12-

palpation at the lateral and anterior joint line and over the lateral and superior patella. (R. at 145.) Smith's muscle strength graded to 5/5, and she had limited active and passive range of motion with extension and flexion of the knee. (R. at 145.) Dr. Litton diagnosed knee sprain, osteoarthritis of the knee, a meniscus tear, prepatellar bursitis and a lateral collateral ligament tear. (R. at 145.) Dr. Litton continued Smith on Flexeril, prescribed Relafen 500 mg. and ordered knee x-rays. (R. at 145.) On October 12, 2004, Dr. Litton's findings were similar to those of Smith's July 14, 2004, visit. (R. at 140.) Dr. Litton continued Smith on her then-current medications, and he ordered a radiologic examination of the spine. (R. at 142.)

On November 16, 2004, Dr. Litton noted that Smith was then taking Relafen 750 mg., while her Paxil was increased to 40 mg. daily. (R. at 138-39.) On December 27, 2004, Dr. Litton's findings were similar to those from July 14, 2004, and October 12, 2004. (R. at 131-33, 140-42, 153-55.) Dr. Litton, however, did perform a lower back examination, noting a brisk femoral pulse with 2/4 patellar and Achilles' deep tendon reflexes and intact superficial reflexes. (R. at 133.) Smith's iliopsoas, quadriceps, hip adductors, gluteus maximus and medius muscles were graded 5/5 in muscle strength. (R. at 133.) Dr. Litton's diagnosed possible facet joint arthritis, a herniated lumbar disc, degeneration of lumbar disc, isthmic spondylolisthesis, lumbar spinal stenosis, cauda equina syndrome and overuse syndrome. (R. at 133.) Dr. Litton prescribed Tylox 5 mg./500 mg. and ordered an MRI of the spine. (R. at 133.)

On January 13, 2005, February 2, 2005, February 28, 2005, March 22, 2005, and April 25, 2005, Smith's pain was characterized similarly to previous visits, as

were the results of Dr. Litton's lower back exam. (R. at 108-127.) On January 13, 2005, Dr. Litton reported that Smith had gained weight and had a job that required her to stand for long durations. (R. at 125.) Dr. Litton noted that Smith's MRI of the lumbar spine was within normal limits, and he reminded Smith that the most likely cause of her back pain was a combination of her obesity, bone thinning from smoking cigarettes and continued weight-bearing on her feet. (R. at 127.) Dr. Litton referred Smith to a chronic pain specialist for a possible epidural steroid injection, and prescribed Daypro 600 mg. daily, discontinuing Smith's Relafen. (R. at 127.)

On February 2, 2005, it was noted that Smith had a lumbar block performed at the pain center. (R. at 122.) At that visit, Dr. Litton prescribed Robaxin 500 mg. (R. at 124.) On February 28, 2005, Dr. Litton noted that Smith's continual weight gain was making her pain control more difficult, and he referred her to a neurosurgeon. (R. at 118.) On March 22, 2005, Smith reported a mass in her neck, which was first noticed two weeks prior to her visit. (R. at 112.) The mass was characterized as painless, soft and mobile, and was located primarily in the middle of the right side of the neck. (R. at 112.) Dr. Litton performed a neck examination, which revealed no pain on palpation; no crepitus and no warmth; 2/4 biceps, brachioradialis and triceps deep tendon reflexes; 5/5 graded muscle strength of the deltoid, bicep, tricep and intrinsic muscles of the cervical spine; and full active and passive range of motion with neck flexion and extension and lateral flexion and rotation. (R. at 114.) Dr. Litton diagnosed primary localized osteoarthritis in the lower leg, and an ultrasound and neck x-ray was ordered. (R. at 114-15.) On April 6, 2005, Dr. Litton's charts noted a scheduled CT scan, recommended by Smith's ultrasound report. (R. at 109.)

-14-

Smith presented to Dr. Litton on May 31, 2005,[7] and August 10, 2005, complaining of back pain. (R. at 275-82.) Smith's pain was characterized similarly to previous visits, and she was given a prescription for Duragesic 25 mcg. patches on May 31, 2005, which was increased to Duragesic 50 mcg. patches on August 10, 2005. (R. at 275-82.) Smith presented to Dr. Litton on September 9, 2005, for a hypothyroidism follow-up, complaining of myalgias. (R. at 268-71.) As a result of Smith's hypothyroidism, she experienced arthralgias, fatigue, myalgias, weakness and weight gain. (R. at 268.) Smith denied symptoms of depression. (R. at 268.) Smith reported that her myalgias began two years prior to the visit date, were of moderate intensity, were worse over the previous month and were not improved by pain medication. (R. at 268.)

Dr. Litton treated Smith again on September 20, 2005, for back pain. (R. at 260-62.) Dr. Litton noted that Smith's back pain "constantly bothers her regardless of her activity," and that Smith had tenderness in the paraspinal muscles. (R. at 260, 262.) On October 18, 2005, Dr. Litton noted that Smith's back pain was primarily located in the thoracic spine and the lumbar spine, radiating to her right buttock, posterior thighs, right calf and right foot. (R. at 256.) Smith characterized her pain as constant, mild in severity, dull, aching, burning and cramping. (R. at 256.) Aggravating factors to Smith's pain included lifting, bending over and twisting, while stiffness occurred after prolonged sitting or standing. (R. at 256.) Dr. Litton also noted paravertebral muscle spasms and radicular right leg pain. (R. at 256.) In addition, Smith complained of right upper quadrant abdominal pain that

---

[7] Smith's medical records from Dr. Litton for the period May 31, 2005, to July 12, 2006, were received during the hearing before the ALJ.

-15-

radiated to the upper back and intrascapular area. (R. at 256.) Smith characterized her abdominal pain as aching and cramping and of moderate intensity. (R. at 256.) Dr. Litton increased the dosage of Smith's Tylox, and he ordered abdominal plain film x-rays and an abdominal ultrasound. (R. at 258-59.)

Smith again presented to Dr. Litton on November 21, 2005, complaining of back pain. (R. at 253-55.) Smith's pain was characterized similarly to her prior visit on October 18, 2005, and a low back examination revealed bilateral inferior superior medial latisimus dorsi and lumbar paraspinous muscle pain and bilateral inferior superior medial latisimus dorsi tenderness. (R. at 255.) Dr. Litton also noted a brisk femoral pulse with 2/4 patellar and Achilles' deep tendon reflexes and intact superficial reflexes, while Smith's iliopsoas, quadriceps, hip adductors, gluteus maximus and medius muscles were graded 5/5 in muscle strength. (R. at 255.)

Smith presented to Dr. Litton again on January 17, 2006, complaining of back pain and requesting that Dr. Litton complete a disability form. (R. at 244.) Dr. Litton noted that Smith had a previous fibromyalgia diagnosis and that she described the intensity of her tender points as severe. (R. at 244.) Dr. Litton reported that Smith's fibromyalgia symptoms were rapidly and aggressively becoming worse and that her overall quality of life was slightly worse. (R. at 244.) Dr. Litton's treatment notes indicated that the primary joints affected included the cervical, thoracic and lumbar spine, shoulders, hips, knees and feet, while tender spots were located on the entire back, both scapular regions, shoulders and the mid and lower posterior neck. (R. at 244.) Dr. Litton's musculoskeletal review revealed arthralgias, chronic and recurrent back pain, joint stiffness, limb pain and myalgias.

(R. at 244.) Fibromyalgia and neck pain were added to Dr. Litton's record of Smith's current problems. (R. at 246.) A neck exam revealed that Smith's neck was supple with full range of motion. (R. at 246.) Smith's musculoskeletal exam revealed a slowed gait and 4/5 bilateral triceps, hip flexors, biceps, wrist flexors and quadriceps muscle strength. (R. at 246.) Dr. Litton also noted decreased range of motion accompanied by pain in the neck, shoulders, back, hips and ankles. (R. at 246.)

Smith again presented to Dr. Litton on February 27, 2006, to be evaluated for lower back pain. (R. at 240-43.) Dr. Litton noted that Smith saw Dr. Rebekah C. Austin, M.D., in a neurosurgery consultation a few months prior and was told by Dr. Austin that she had a lumbar disc herniation. (R. at 240.) Dr. Litton increased the frequency of Smith's Tylox prescription, and reported all other results, including a neck and musculoskeletal examination, similar to her previous visit. (R. at 240-43.) Smith continued to be evaluated on April 17, June 1, June 19 and July 12, 2006, for her chronic back pain and associated problems. (R. at 220-36.) These four visits resulted in similar test results and similar characterization of Smith's pain. (R. at 220-36.)

On July 12, 2006, Dr. Litton completed a Physical Residual Functional Capacity Questionnaire for Smith. (R. at 215-19.) At that time, Dr. Litton's diagnoses were lumbar disc herniation, back pain, neck pain and depression, and he noted that her prognosis was fair. (R. at 215.) Dr. Litton noted that an MRI revealed disc herniation, and an x-ray revealed degenerative disc disease. (R. at 215.) Dr. Litton determined that Smith's impairments had lasted, or could be expected to last, at least 12 months, Smith was not a malingerer, depression and

anxiety affected Smith's physical condition and that Smith's impairments were reasonably consistent with her symptoms and functional limitations. (R. at 216.) Dr. Litton noted that Smith's pain and other symptoms frequently affect her ability to concentrate and that Smith was incapable of even "low stress" jobs. (R. at 216.) As a result of Smith's impairments, Dr. Litton determined that she could walk one-half a city block before needing to rest or having pain, that Smith could sit for 15 minutes at a time, stand for 10 minutes at a time and sit or stand/walk for no more than two total hours in a typical eight-hour work day. (R. at 217.) Dr. Litton further noted that Smith needed to walk for five minutes at a time every 30 minutes and that she required a job that permitted shifting positions at will and unscheduled breaks. (R. at 217.) Dr. Litton also determined that Smith could never twist or climb ladders and that she should only rarely stoop, crouch or climb stairs. (R. at 218.) In addition, Dr. Litton noted that Smith had significant limitations with reaching, handling or fingering, and that Smith would be expected to miss work about two days a month because of her impairments. (R. at 218-19.)

Dr. Litton referred Smith to Dr. Dennis M. Aguirre, M.D., for pain management. (R. at 102.) Smith presented to Dr. Aguirre on January 18, 2005, complaining of occasional pains and difficulties with her lower back, occasional radicular problems in her lower extremities and increased bilateral lower extremity radiculopathy. (R. at 103-05.) Smith reported her pain level to Dr. Aguirre as regularly being equivalent to five on a 10-point scale. (R. at 103.) Smith also reported that her pain increased as a result of bending, stooping, pushing and twisting. (R. at 103.) Dr. Aguirre's cervical examination revealed a negative

-18-

Spurling's test[8] and negative Lhermitte's sign.[9] (R. at 104.) Dr. Aguirre also noted that "[m]otors are 5/5 bilaterally upper extremities" and that Smith's deep tendon reflexes were "2+ bilateral upper extremities." (R. at 104.) Dr. Aguirre's lumbar spine examination revealed positive hyperextension, forward flexion to 30 degrees with pain, spinous process tenderness at approximately the L4-5 level, negative sacroiliac joint tenderness bilaterally, sciatic notch tenderness on the right side, a negative Patrick's test,[10] a positive straight leg raise at 60 degrees, negative long track signs, a negative Babinski's clonus sign,[11] Oppenheim's sign,[12] positive tension signs on the right side and minimal difficulties with heel toe walking on Smith's right side. (R. at 104.) Dr. Aguirre also noted that Smith's "[m]otors are 5/5 left lower extremity and 5/5 right lower extremity, with the exception of dorsiflexion and plantar flexion, which is on the right lower extremity" and that "[d]orsalis pedis and posterior tibialis palpable bilaterally at 2+." (R. at 104.)

　　Dr. Aguirre determined that Smith's x-rays revealed minimal degenerative changes of the thoracic spine and that the x-rays showed minimal degenerative disc changes and facet joint arthropathy at the L5-S1 level. (R. at 104.) Dr. Aguirre also reviewed an MRI taken in December 2004 at LRMC, noting the images were of poor quality, that the sagittal images appeared to have minimal evidence of

---

[8] Spurling's test is performed with the spine extended with the head rotated to the affected shoulder while axially loaded. A positive result suggests a cervical nerve root disorder. See http://www.aafp.org/afp/20000515/3079.html.

[9] Lhermitte's sign is the development of sudden, transient, electric-like shocks spreading down the body when the patient flexes the head forward. This condition is seen mainly in multiple sclerosis, but also in compression and other disorders of the cervical cord. See DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1524 (27th ed. 1988).

[10] Patrick's test is performed with the patient in the supine position, with the thigh and knee flexed and the external malleolus is placed over the patella of the opposite leg. The knee is depressed and if pain is produced thereby, arthritis of the hip is indicated. This test is sometimes called fabere sign, from the initial letters of movements that are necessary to elicit it, namely flexion, abduction, external rotation and extension. See Dorland's at 1688.

[11] Babinski's sign refers to the loss or lessening of the Achilles' tendon reflex in sciatica. See Dorland's at 1520.

[12] Oppenheim's sign is dorsiflexion of the big toe on stroking downward the medial side of the tibia. This is seen in pyramidal tract disease. See Dorland's at 1524.

-19-

degenerative disc changes at the L5-S1 level of the spine and the actual images appeared to show a minimal central disc bulge at the L5-S1 level. (R. at 104-05.) Dr. Aguirre also noted that Smith had not been treated with any bracing, physical therapy or any treatments by injection. (R. at 105.) As a result of his testing, Dr. Aguirre diagnosed Smith with low back pain with bilateral lower extremity radiculopathy and a minimal central disc bulge at the L5-S1 level. (R. at 105.) Dr. Aguirre also ordered Smith to be scheduled for McKenzie therapy[13] and a lumbar epidural block, and he provided Smith with a prescription for a buffalo brace. (R. at 105.) On January 19, 2005, Smith presented to Bristol Surgery Center for a lumbar epidural steroid injection with no apparent complications. (R. at 194.)

E. Hugh Tenison, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on May 2, 2005. (R. at 195-207.) Tenison's assessment revealed a nonsevere impairment, namely depression. (R. at 195, 198.) Tenison reported that Smith had no limitation on activities of daily living, in maintaining social functioning and that she had experienced no repeated episodes of decompensation. (R. at 205.) Tenison reported that Smith had mild difficulties maintaining concentration, persistence or pace. (R. at 205.) Tenison noted that Smith's mental allegations were minimally credible and her mental limitations were slight. (R. at 207.) Howard Leizer, Ph.D., another state agency psychologist, reviewed Tenison's report and affirmed his findings on July 20, 2005. (R. at 195.)

---

[13] McKenzie therapy is a method of physical therapy and exercise used to extend the spine to centralize the patient's pain by moving it away from the extremities to the back, to allow for better treatment. *See* http://www.spine-health.com/topics/conserv/mckenzie/mck01.html.

Dr. Richard M. Surrusco, M.D., a state agency physician, completed a physical residual functional capacity assessment on May 9, 2005. (R. at 208-14.) Dr. Surrusco found that Smith was able to occasionally lift and/or carry items weighing up to 20 pounds, and that she was able to frequently lift and/or carry items weighing up to 10 pounds. (R. at 209.) Additionally, Dr. Surrusco found that Smith was able to stand and/or walk for a total of about six hours in an eight-hour workday. (R. at 209.) Moreover, Dr. Surrusco determined that Smith was capable of sitting for a total of about six hours in an eight-hour workday, and that she possessed a limited ability to push and/or pull with her lower extremities. (R. at 209.) Dr. Surrusco found that Smith was able to frequently balance, but that she could only occasionally climb, stoop, kneel, crouch and crawl. (R. at 210.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 210-11.) Dr. Surrusco found that the medical evidence established a medically determinable impairment of lumbar radiculopathy and a minimal central disc bulge at the L5-S1 level of the spine. (R. at 213.) Dr. Surrusco concluded that Smith's allegations as to her limitations were partially credible. (R. at 214.) Dr. Michael J. Hartman, M.D., another state agency physician, reviewed Dr. Surrusco's report and affirmed his findings on July 20, 2005. (R. at 214.)

After being referred by Dr. Litton, Smith sought treatment from Dr. Rebekah C. Austin, M.D., a neurosurgeon, from July 15, 2005, to August 5, 2005. (R. at 298-315.) Smith presented to Dr. Austin on July 15, 2005, complaining of right lower extremity pain, right upper extremity pain and lumbar pain. (R. at 298.) Dr. Austin noted that Smith reported a 10-year history of intermittent right lower extremity pain with occasional mild low back pain. (R. at 298.) Smith described her low back pain as a burning type sensation in her lower back, which radiated

down the right posterior thigh and calf into the top of the right foot, primarily affecting the big toe. (R. at 298.) Dr. Austin noted that Smith's symptoms worsened with increased activity and improved slightly with change in position and rest. (R. at 298.) Dr. Austin's medical history noted that Smith had a history of thyroid disease, but there was no notation of any history of fibromyalgia. (R. at 298.) Dr. Austin's musculoskeletal examination revealed Smith's gait to be antalgic to the right, and it revealed tenderness of the lower lumbar spine. (R. at 299.) Smith's straight leg raise test was negative bilaterally, and Dr. Austin reported no limitation of motion of the head, neck, left or right upper extremity or left or right lower extremity. (R. at 299.) Dr. Austin assessed Smith's muscle strength to be 5+ and her tone to be normal. (R. at 299.) Dr. Austin diagnosed low back pain and right leg pain with possible L5 radiculopathy. (R. at 300.) Dr. Austin opined that Smith could not return to work at that time. (R. at 300.)

On August 5, 2005, Smith presented to Dr. Austin for a follow-up of lumbar pain, right upper extremity pain and right lower extremity pain, and to review radiographic studies previously ordered by Dr. Austin. (R. at 303.) Dr. Austin's musculoskeletal and related examinations revealed similar results to Smith's prior visit. (R. at 304.) Dr. Austin reviewed a lumbar myelogram with a postmyelographic CT scan, noting that it revealed a small disc bulge at the L4-5 level of the spine and no nerve root compression or central canal stenosis. (R. at 305.) Dr. Austin again opined that Smith could not return to work at that time and that future work issues would be decided at the discretion of Smith's primary care physician. (R. at 305.)

On January 6, 2005, an unidentifiable physician completed a physical assessment of ability to do work-related activities.[14] (R. at 312-14.) It was noted that Smith's lifting and carrying was affected by her impairments and that she could occasionally lift or carry items weighing up to five pounds and that she could not frequently lift or carry any items. (R. at 312.) It was further noted that Smith's abilities to stand, walk and sit were affected by her impairments and that she could stand or walk for 30 minutes and sit for 15 minutes without interruption. (R. at 312.) It also was determined that Smith could never climb, stoop, kneel, balance, crouch or crawl, and that reaching, feeling, pushing and pulling were affected by her impairments. (R. at 313.) These findings were supported by Smith's fibromyalgia, major depression, chronic pain and spasms, osteoarthritis of the lower extremities and obesity. (R. at 314.)

## II. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2007); *see also Heckler v. Campbell*, 471 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point

---

[14] This assessment appears on pages 312 to 315 of the record, a section that has been attributed to the medical records of Dr. Austin. This assessment is referred to as Dr. Litton's assessment in the plaintiff's Brief in Support of Motion for Summary Judgment. However, the signature on this assessment is illegible.

-23-

in the process, review does not proceed to the next step. *See* 20 C.F.R. §
404.1520(a) (2007).

Under this analysis, a claimant has the initial burden of showing that she is
unable to return to her past relevant work because of her impairments. If the
claimant is able to establish a prima facie case of disability, the burden shifts to the
Commissioner. To satisfy the burden, the Commissioner must then establish that
the claimant maintains the residual functional capacity, considering the claimant's
age, education, work experience and impairments, to perform alternative jobs that
exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 &
Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*,
658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated September 14, 2006, the ALJ denied Smith's claim. (R. at
13-20.) The ALJ found that Smith's musculoskeletal impairments related to her
back and knee pain were severe. (R. at 19.) However, the ALJ determined that
Smith did not have impairment or combination of impairments listed at or
medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at
19.) The ALJ found that Smith possessed the residual functional capacity to
perform light work diminished by an ability to only occasionally bend, stoop,
kneel, squat and crawl. (R. at 19.) Thus, the ALJ determined that Smith was unable
to perform any of her past relevant work. (R. at 19.) Based upon Smith's age,
education, past work experience, and residual functional capacity and the
testimony of a vocational expert, the ALJ concluded that Smith could perform jobs
existing in significant numbers in the regional and national economies, including
those of a cashier, a food service worker, a motel cleaner, a laundry worker and a

factory worker. (R. at 19-20.) Therefore, the ALJ found that Smith was not under a "disability" as defined under the Act and was not entitled to benefits. (R. at 20.) *See* 20 C.F.R. § 404.1520(g) (2007).

Smith argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-11.) In particular, Smith first argues that the ALJ erred in giving "little probative weight" to the restrictions of her treating physician, Dr. Litton. (Plaintiff's Brief at 8-9.) Second, Smith argues that the Commissioner failed to establish that Smith could perform work in the national economy. (Plaintiff's Brief at 9-10.) Third, Smith argues that the ALJ failed to evaluate the cumulative effects of all of her impairments. (Plaintiff's Brief at 10-11.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir.

1975). Specifically, the ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Smith's first argument is that the ALJ erred in assessing her residual functional capacity because the ALJ gave "little probative weight" to Dr. Litton's assessment. (Plaintiff's Brief at 8-9.) An ALJ may "give less weight to the testimony of a treating physician if there is persuasive contrary evidence." *See Hines v. Barnhart*, 453 F.3d 559, 563 n.2 (4th Cir. 2006) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[15] If the ALJ does give less weight to the treating physician, the ALJ also must give good reasons for the weight given to the treating physician's opinion. *See* 20 C.F.R. § 404.1527(d)(2) (2007).

In this case, the ALJ considered the opinions of Smith's treating physician, Dr. Litton, along with the overall evidence of the record, and provided good reasons for the weight given to Dr. Litton's opinion. (R. at 17.) The ALJ stated that

---

[15] Hunter was superseded by 20 C.F.R. § 404.1527(d)(2), which states in relevant part, as follows:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2) (2007).

he found the opinions of Dr. Bland, supported by two state agency physicians, to be more controlling, and that he gave Dr. Litton's opinion little probative weight. (R. at 17.) This court will not disturb the ALJ's finding as long as the ALJ provides good reasons for his opinion and substantial evidence in the record exists to support his opinion. In this case, the ALJ's reasons for giving Dr. Litton's opinions little probative weight is provided in the ALJ's opinion and supported by substantial evidence in the record. The ALJ pointed to inconsistencies in Dr. Litton's records, noting that Dr. Litton's examinations were "fairly negative" and noting that radiological studies did not show any nerve root compression or spinal canal stenosis. (R. at 17.) Moreover, the testimony and opinion of the medical expert, Dr. Bland, and the findings of Dr. Surrusco and Dr. Hartman provide persuasive contrary evidence that supports the ALJ's decision. (R. at 17.) Because "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence," *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (citing *Hunter*, 993 F.2d at 35), the ALJ did not err in assigning little weight to Dr. Litton's opinion.

Smith's second argument is that the Commissioner failed to establish that Smith could perform work in the national economy. (Plaintiff's Brief at 9-10.) Under the Act, once the plaintiff has established that she cannot perform her past relevant work, the Commissioner has the burden of showing that she can perform other work in the national economy. *See* 20 C.F.R. § 404.1520(g) (2007). In establishing that a plaintiff can perform other work, testimony of a vocational expert constitutes substantial evidence if the vocational expert's opinion is based upon consideration of all the evidence in the record and is in response to proper hypothetical questions, which fairly set out all of the claimant's impairments. *See*

*Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005). In this case, the ALJ relied on testimony from a vocational expert to identify jobs that Smith could perform in the national economy. Based upon a proper hypothetical, that fairly set forth all of the claimant's impairments, the vocational expert stated that there were jobs available that Smith was capable of performing, including the jobs of a cashier, a food server, a motel cleaner, a salad bar attendant, a laundry worker and factory worker jobs such as an assembler, a machine feeder, an off bearer and a machine tender.[16] (R. at 341.) The vocational expert testified that there would be more than 100,000, and closer to 200,000, of these kinds of jobs in the State of Virginia and more than 4 million of these jobs nationally. (R. at 341.)

Smith argues that the ALJ erred in relying on the vocational expert's testimony because that testimony conflicted with information in the Dictionary of Occupational Titles, ("DOT"). (Plaintiff's Brief at 10.) Smith points out that the jobs of food service worker, factory worker and motel cleaner are all jobs that require medium exertion, according to the DOT. (Plaintiff's Brief at 10.) Indeed, a review of the DOT for the jobs noted above reveals inconsistencies regarding the exertional levels of these jobs and similar jobs, which the vocational expert testified required "light" exertion. For example, the DOT contains the following:

> 1.  Janitor (any industry) alternate titles: maintenance engineer; superintendent, building. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES, janitor, occupational code 382.664-010 at 282 (4th ed. rev. 1991).

---

[16] While Hankins opined that there would be no jobs available to Smith, assuming Dr. Litton's opinions were correct, (R. at 341-42), the ALJ, as noted above, was supported by substantial evidence in giving little probative weight to Dr. Litton's assessment.

2.      Cleaner, Industrial (any industry) alternate titles: clean-up worker; janitor; sanitor; scrubber; sweeper; trash collector; vacuum cleaner; waste collector. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES, cleaner, industrial, occupational code 381.687-018 at 282 (4th ed. rev. 1991).

3.      Laundry Laborer (laundry & rel.) alternate titles: bundle clerk. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES laundry laborer, occupational code 361.687-018 at 261 (4th ed. rev. 1991).

4.      Laundry-Machine Tender (tex. Prod., nec). The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES, laundry-machine tender, occupational code 589.685-066 at 499 (4th ed. rev. 1991).

5.      Laundry Operator (laundry & rel.). The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES, laundry operator, occupational code 369.684-014 at 266 (4th ed. rev. 1991).

6.      Launderer, Hand (laundry & rel.). The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES, launderer, hand, occupational code 361.684-010 at 260 (4th ed. rev. 1991).

7.      Laundry Worker I (any industry) alternate titles: camp-laundry operator; company laundry worker. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES, laundry worker I, occupational code 361.684-014 at 260 (4th ed. rev. 1991).

8.      Laundry Worker II (any industry). The DOT notes the exertional requirement to perform this job as medium. *See* 1

DICTIONARY OF OCCUPATIONAL TITLES, laundry worker II, occupational code 361.685-018 at 261 (4th ed. rev. 1991).

9. Kitchen Clerk (hotel & rest.), alternate titles: storeroom food-checker. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Kitchen Clerk, Occupational Code 222.587-022 at 203 (4th ed. rev. 1991).

10. Kitchen Helper (hotel & rest.) alternate titles: cookee; cook helper; kitchen hand; kitchen porter; kitchen runner. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES, kitchen helper, occupational code 318.687-010 at 245-46 (4th ed. rev. 1991).

11. Kitchen Steward/Stewardess (hotel & rest.). The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES, kitchen steward/stewardess, occupational code 318.137-010 at 245 (4th ed. rev. 1991).

12. Cook (hotel & rest.) alternate titles: cook, restaurant. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES, cook, occupational code 313.361-014 at 242-43 (4th ed. rev. 1991).

13. Factory Helper (sugar & conf.) alternate titles: general utility helper. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES, factory helper, occupational code 529.686-034 at 385 (4th ed. rev. 1991).

Because these jobs require medium exertion and the ALJ determined that Smith could perform only light exertion jobs, Smith argues that the ALJ erred in relying on the vocational expert's testimony. (Plaintiff's Brief at 10.) More specifically, Smith contends that the ALJ erred by relying upon testimony which

was not consistent with the DOT without attempting to resolve the conflict, as required by Social Security Ruling 00-4. Social Security Ruling 00-4 instructs, in part, the following:

> This Ruling clarifies our standards for the use of vocational experts [] who provide evidence at hearings before administrative law judges … In particular, this ruling emphasizes that before relying on [vocational expert] evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by [vocational experts] and information in the Dictionary of Occupational Titles (… and Explain in the determination or decision how any conflict that has been identified was resolved.
>
> . . .
>
> Occupational evidence provided by a [vocational expert] generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between [vocational expert] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert's] evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.
>
> . . .
>
> When a [vocational expert] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that [vocational expert's] evidence and information provided in the DOT.
>
> In these situations, the adjudicator will:

> Ask the [vocational expert] if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the [vocational expert's] evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

S.S.R. 00-4, (WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 2007 Supp.).

In this case, the ALJ failed to ask the vocational expert if the evidence he provided conflicted with information in the DOT. Under the Commissioner's own ruling, the ALJ is under an affirmative duty to inquire into conflicts between the vocational expert's testimony and the DOT. *See Haddock v. Apfel*, 196 F.3d 1084, 1087 (10th Cir. 1999) ("We hold that before an ALJ may rely on expert vocational evidence as substantial evidence to support a determination of nondisability, the ALJ must ask the expert how his or her testimony as to the exertional requirement of identified jobs corresponds with the Dictionary of Occupational Titles, and elicit a reasonable explanation for any discrepancy on this point."); *see also Oxendine v. Massanari*, 181 F. Supp. 2d 570, 573-75 (E.D.N.C. 2001) (concluding that the Fourth Circuit has adopted the rule set out in *Haddock,* noted *supra*, therefore adopting SSR 00-4P); *but cf. Justin v Massanari*, No. 01-1447, 20 Fed. Appx. 158, *160 (4th Cir. Oct. 2, 2001) (unpublished) (noting that AR 00-3(10),[17] even if applicable outside the Tenth Circuit, only requires an ALJ to address evident discrepancies between a vocational expert's testimony and the DOT, and specifically declines to place an obligation on ALJs to uncover such discrepancies)

---

[17] Acquiescence Ruling 00-3(10) rules on the implications of *Haddock* in the Tenth Circuit.

-32-

(citing A.R. 00-3(10), WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 2007 Supp.) and S.S.R. 00-4;[18] *but see* S.S.R. 00-4, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 2007 Supp.) ("At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is [consistency between the vocational expert's testimony and the DOT]," and "[w]hen a [vocational expert] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that [vocational expert's] evidence and information provided in the DOT."); *see also Gull v. Barnhart*, 2006 WL 1982769 at *9 (W.D. Va. July 14, 2006) (unpublished) ("Remand is also appropriate because of the ALJ's failure to inquire about any possible inconsistencies between the [vocational expert's] testimony and the DOT."); *see also Smith v. Barnhart*, 2005 U.S. Dist. LEXIS 42836, at *56-57 (N.D. W.Va. Sept. 12, 2005) (unpublished) (finding that the ALJ correctly applied SSR 00-4 by inquiring whether there were any conflicts between the vocational expert's testimony and the DOT). The ALJ, therefore, erred by not asking the vocational expert if the evidence he provided conflicted with information in the DOT and, thus, he was unable to adequately provide a reason for this conflicting information.

Moreover, the ALJ failed to establish that sufficient numbers of light exertion jobs were available to Smith. The vocational expert testified that there would be more than 100,000, and closer to 200,000, total jobs available in Virginia

---

[18] While the United States Court of Appeals for the Fourth Circuit, in its unpublished *Justin* opinion, cites SSR 00-4P in discussing the implications of *Haddock* and AR 00-3(10), the undersigned is of the belief that AR 00-3(10) and SSR 00-4P are in direct contradiction of each other and will rule accordingly until the Fourth Circuit's opinion regarding SSR 00-4P is clarified.

and more than 4 million total jobs nationally, but the vocational expert did not offer testimony regarding the number of jobs available for each particular type of job listed. Because some of the jobs the vocational expert identified are listed in the DOT as requiring medium exertion, it is not possible for the undersigned to identify how many of these jobs require only light exertion. Moreover, the vocational expert did not provide any testimony indicating why those particular jobs, despite their listing as medium exertion, would be available for Smith. Therefore, the Commissioner failed to establish that there were a significant number of jobs available that Smith could perform, and the ALJ erred by not adequately developing the record regarding the testimony of the vocational expert.

Smith's third argument is that the ALJ erred by failing to evaluate the cumulative effect of all of her impairments. (Plaintiff's Brief at 10-11.) To determine "whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments." *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) (per curiam) (citing *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985)). Additionally, the ALJ must adequately explain his or her evaluation of the combined effect of impairments. *See Reichenbach*, 808 F.2d at 312. "This rule merely elaborates upon the general requirement that an ALJ is required to explicitly indicate the weight given to relevant evidence." *Hines*, 872 F.2d at 59 (citing *Murphy v. Bowen*, 810 F.2d 433, 437 (4th Cir. 1987)).

In this case, the ALJ separately addressed each of Smith's alleged impairments. (R. at 16.) He also included findings that Smith's combination of impairments did not meet or equal a disability. (R. at 16.) Therefore, based on my

review of the record, I find that the ALJ did consider the combination of Smith's impairments in relation to her ability to perform basic work activities.

*IV. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated, and this case will be remanded to the Commissioner for further consideration consistent with this Memorandum Opinion.

An appropriate order will be entered.

DATED: This 28th day of August 2007.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE